UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x

ANTHONY DANIELS,

      Petitioner,

          -against-

MARK ROYCE,

      Respondent.

----------------------------------x

**MEMORANDUM & ORDER**
19-CV-6603(EK)(LB)

I.   Background................................................ 4
  A.  Pre-Trial Hearing ...................................... 4
  B.  Trial ................................................. 11
    1.  State's Case-in-Chief .............................. 11
    2.  Defense Case ...................................... 15
    3.  State's Rebuttal Case ............................. 16
    4.  Conviction and Sentencing ......................... 17
  C.  Appeals and Collateral Proceedings .................... 18
II.  Legal Standards ......................................... 19
III. Discussion .............................................. 21
  A.  Identification Procedures and Evidence ................ 21
    1.  The Photo Array Shown to Officer Hughes ............ 21
    2.  The Lineup ........................................ 25
    3.  Insufficient Evidence to Convict .................. 27
  B.  Prosecutorial Misconduct ............................. 30
    1.  *Brady v. Maryland* ............................... 31
      a.  The Handbag Claim .............................. 31
      b.  The Surveillance Video Claim .................. 33
    2.  Use of False Testimony ............................ 35
    3.  False Statements in Summation ..................... 37
  C.  Ineffective Assistance of Counsel .................... 41

      1.  The Affirmative Defense Under Section 160.15(4) ....... 42

      2.  Other IAC Claims ..................................... 46

  D.  Double Jeopardy ........................................ 48

  E.  Lack of Probable Cause ................................. 49

  F.  Actual Innocence Based on "New Evidence" .............. 52

IV.  Daniels' Motion for Discovery .......................... 53

V.  Conclusion ............................................. 54

Anthony Daniels, proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petition, ECF No. 1 ("Pet."). Daniels challenges his convictions for two robberies committed six days apart in April 2012 in Brooklyn. In both incidents, a partially masked man followed a woman into her apartment building and robbed her. The first robbery was witnessed only by the victim. Police officers quickly responded to the second, however, and got a look at the suspect. They also recovered items he had discarded, including the metal object he had used to threaten the victim — a crude facsimile of a gun. Days later, one of the responding officers viewed a photo array and identified Anthony Daniels as the suspect. That officer and both victims then identified Daniels in a lineup, at which point he was charged.

Following a bench trial in 2014, Daniels was convicted of two counts of Robbery in the First Degree and one count each of Attempted Assault in the Second and Third Degree.[1] He is currently in the custody of Green Haven Correctional Facility in Dutchess County, New York.

I construe Daniels' petition liberally, as is required for *pro se* litigants. *E.g.*, *Johnson v. Fogg*, 653 F.2d 750, 753 (2d Cir. 1981). On that basis, I read him to assert the

---

[1] The judge declined to consider an additional count – for third-degree robbery – after convicting Daniels of first-degree robbery. Trial Transcript ("T.") 390:9-11, ECF No. 16-3.

following claims: (1) the photo array and lineup violated the Due Process Clause of the Fourteenth Amendment because they were conducted in a suggestive manner; (2) he was convicted on the basis of insufficient evidence, also in violation of due process; (3) the prosecution violated its obligations under *Brady v. Maryland*, 373 U.S. 82 (1967), by failing to produce certain exculpatory evidence, and committed prosecutorial misconduct by failing to correct false testimony; (4) trial counsel was constitutionally ineffective because, among other things, he failed to assert an affirmative defense under state law that the weapon used in the first robbery was inoperable; (5) the convictions for first- and third-degree robbery violated the Double Jeopardy Clause; (6) there was no probable cause for Daniels' arrest; and (7) he is actually innocent, as shown by certain newly discovered evidence.

None of these claims has merit.  For the reasons set forth below, the petition is denied.

## I.   Background

### A.  Pre-Trial Hearing

Prior to trial, Daniels moved under *Wade v. United States*, 388 U.S. 218 (1967), to suppress any testimony at trial concerning the photo array and lineup as unduly suggestive. Hearing Transcript ("H.") 54:23-56:17, ECF No. 16-1.  He also argued a second basis to suppress the lineup identifications:

4

that the police lacked probable cause to arrest him, and therefore he should not have appeared in that lineup in the first place. *See* H. 34:19-21 (citing *Dunaway v. New York*, 442 U.S. 200 (1979)).  State Supreme Court Justice Jon Firetog conducted a hearing on the *Wade* and *Dunaway* motions on December 4, 2013; the prosecution called the investigating agent, Detective Marisol Bonilla of the 90th Precinct, as its sole witness.  Bonilla testified about the statements she took from the victims and responding officers and the identification procedures she conducted.

Bonilla's testimony began with the second robbery (of Taylor Westfall).  Bonilla and her partner took a statement from Westfall on the night of that incident – April 12, 2012.  *Id.* at 38:8-11.  Westfall reported that at approximately 9:50 p.m., she was walking into the vestibule of her apartment building – at 155 Manhattan Avenue in Williamsburg, Brooklyn – when a man entered behind her and tried to grab her purse.  *Id.* at 5:6-10, 5:21-24.  When she would not let go of it, he hit her over the head four to five times with what appeared to be a firearm.  *Id.* at 5:10-13.  Westfall fell to the ground, and the suspect kicked her.  *Id.* at 5:14-16.  The suspect ran out of the building with her purse and fled by bicycle.  *Id.* at 5:16-17.  She followed him into the street, screaming for help, *id.* at 6:1-3, and an unmarked police vehicle pulled up.  *Id.* at 6:4-5, 10:21.  She

told the occupants — Officer Arias[2] and Sergeant Angel Taveras — what happened, and they gave chase. *Id.* at 6:6-7. Westfall later described the suspect to Bonilla as "male[,] black, in his 40s[,] about five ten, 185 pounds, wearing a brown hoodie and a black sweater over it." *Id.* at 6:20-22.

The officers spotted a suspect but lost sight of him shortly thereafter. *Id.* at 10:2-23. They broadcast the suspect's description and location over the NYPD radio network. *See id.* at 8:22-9:7. Officer Arias told Bonilla that he "never got to see the [suspect's] face," but described the suspect as "male[,] black[,] wearing a red hoodie sweater . . . [and] a black jacket over it." *Id.* at 10:23-25.

Officer Sean Hughes was also in the vicinity when he heard the radio call. *Id.* at 8:20-21. Hughes went immediately to the location mentioned in the call – the intersection of Lorimer Street and Throop Avenue – and saw a man on a bicycle fitting the description. *Id.* at 9:4-10. The suspect turned from Throop onto Wallabout Street and threw what appeared to be a black or silver firearm over a fence at 398 Wallabout. *Id.* at 9:14-17. Hughes continued pursuit, but the suspect eluded arrest. *Id.* at 9:22-23. Hughes described the suspect to Bonilla as "male[,] black, 40 to 45 years old," and having

---

[2] Officer Arias's first name does not appear in the record.

"pocked skin, wearing a black sweater with a rust color hoodie, sweater underneath."  *Id.* at 10:7-8.

Arias and Taveras went back to the scene of the robbery to pick up Westfall.  *Id.* at 11:3-5.  They had heard over the radio that items related to the robbery had been located and took Westfall to identify them.  *Id.* at 11:8-9. Westfall identified her purse, which the suspect had discarded while in flight.  *Id.* at 37:6-10.  She identified a hooded sweatshirt found on the ground as matching the one the suspect had been wearing.  *Id.* at 37:11-14.  She also identified the weapon the suspect had used.  *Id.* at 37:15-18.  And she identified an abandoned bicycle as the one on which the suspect had fled.  *Id.* at 37:19-21.

The officers then returned to the 90th Precinct stationhouse with Westfall, where they met with Detective Bonilla.  *Id.* at 11:12-18.  Bonilla showed Westfall and Hughes "hundreds" of intake photographs from the NYPD's "photo manager system" based on their descriptions of the suspect, but they were unable to make an identification.  *Id.* at 11:21-25, 41:24-43:5.

The following week, a sergeant from a neighboring precinct contacted Bonilla to inform her of a case from a few years earlier that involved a similar robbery committed by an individual who was similarly described by an eyewitness.  *Id.* at

12:5-11.  The sergeant told Bonilla that Daniels had been investigated for the offense.  *Id.* at 12:8-20.  Bonilla looked up Daniels in New York State's criminal records database and saw that he "fit the description" of her suspect – a black male between forty and forty-five years old, and around 5'8".[3]  *Id.* at 12:12-13:2.  Bonilla pulled Daniels' photo and compiled a photo array with five "filler" photos from the database.  *Id.* at 12:20-14:8.  On April 18, she showed the array to Officer Hughes, who identified Daniels as the suspect.  *Id.* at 15:1-9.  After Bonilla issued a "wanted poster," Daniels' attorney arranged for him to self-surrender on April 26.  *Id.* at 16:6-7, 33:8-18.

Also on April 26, Bonilla took a statement from Ashley Reardon, the victim of a recent, similar robbery.  *Id.* at 33:19-20.  Reardon told Bonilla that she was entering her building around 7:00 a.m. on April 6 — about a week before the Westfall robbery — when she noticed a man behind her.  *Id.* at 17:11-21.  The man told Reardon to get in the elevator, not to scream, and that he was not going to hurt her.  *Id.* at 17:25-18:2.  He was holding a "shiny chrome colored object that [Reardon] described as [having] a long cylinder shape," though Reardon was unsure whether it was a firearm.  *Id.* at 18:17-19.  The perpetrator

---

[3] Daniels' date of birth is April 23, 1967, so he was 44 years old at the time of the robberies.  T. 3:19, ECF No. 16-1.  Daniels is 5'9" tall. Pet.'s Pre-Appeal Mot. to Vacate Conviction 15, ECF No. 16-4.

demanded that Reardon give him money, but Reardon replied that she had only a cell phone. *Id.* at 18:3-5.  The man searched her, took the phone, and fled. *Id.* at 18:5-21.  Reardon described the man as approximately six feet tall, "light skinned black or dark skinned Hispanic," wearing a camouflage hooded sweatshirt, black vest, and tan cargo pants. *Id.* at 18:23-19:2.

After taking Reardon's statement (and after Daniels had self-surrendered), Bonilla conducted a lineup at the 90th Precinct.  Three people viewed the lineup: Reardon, Westfall, and Officer Hughes.  The lineup included Daniels and five "fillers." *Id.* at 20:20-24.  The fillers were generally similar to Daniels in appearance: "all male[,] black[], bald [like Daniels], between . . . five six to five nine, approximately 150 to 185 pounds." *Id.* at 21:3-9.  All six men wore the same color t-shirt. *Id.* at 21:10-18.  Daniels chose a seat, and his attorney was present. *Id.* at 21:22-22:7.

Reardon, Westfall, and Hughes each arrived at the precinct separately and were isolated in separate rooms prior to the lineup. *Id.* at 22:13-16.  They were instructed to take their time and to let Bonilla know whether they recognized anyone. *Id.* at 24:1-5 (Reardon), 26:9-11 (Westfall), 28:22-25 (Hughes).  Each witness viewed the lineup separately, and each identified Daniels. *Id.* at 24:16-19, 26:21-24, 29:4-9.  Bonilla testified that Reardon "started to cry" when she saw Daniels and

said, "He robbed me." *Id.* at 24:2-23.  Westfall, likewise,

said, "[T]hat's the guy who mugged [me]." *Id.* at 26:25-2.

Hughes stated that Daniels "was the guy he chased during

the . . . robbery." *Id.* at 29:9-10.

In cross-examining Detective Bonilla, Daniels' counsel

sought to establish that the witnesses could not have recognized

the perpetrator because his face was covered by a mask.  Bonilla

testified, however, that neither Westfall nor Officer Hughes had

actually told her that the suspect's face was covered.  *Id.* at

35:19-36:2, 39:10-12.  When Daniels' counsel asked Bonilla if

she knew that "Westfall testified in the Grand Jury . . . that

[the suspect] was wearing a mask the entire time," Bonilla

testified that she had not been aware of that testimony and did

not recall asking Westfall whether the suspect had worn a mask.

*Id.* at 38:22-39:6.[4]

At the conclusion of the hearing, Justice Firetog

denied Daniels' motions.  He denied the *Wade* motion upon finding

that the photographic array and lineup were not suggestive and

---

[4] The grand jury testimony that was the subject of counsel's question is
not in the record.  Nevertheless, by Daniels' own account, Westfall testified
to the grand jury that although the perpetrator was masked, she was able to
identify him "by his height, build, eyes, complexion, and how hard he hit
[her]."  Pet. 26.  Westfall's trial testimony regarding this issue, as
discussed below, is consistent with Daniels' account of her grand jury
testimony.  Indeed, had Westfall's trial testimony been at odds with her
grand jury testimony on this point, Daniels' counsel might have been expected
to address the discrepancy on cross-examination, but he did not do so –
despite probing other elements of her grand jury testimony.  *See* T. 62:21-
64:20, ECF No. 16-1.

that the procedures used in conducting them were permissible.
*Id.* at 55:22-56:17.  Given that finding, he then also denied the
*Dunaway* motion to suppress evidence from the lineup, which was
predicated on the same argument.  *Id.* at 56:18-19.

**B.  Trial**

Daniels waived his right to a jury trial, and a bench
trial was held over five days in May 2014 before Justice Albert
Tomei.

1.  <u>State's Case-in-Chief</u>

The State put on seven witnesses: the two victims,
Westfall and Reardon; Officer Hughes and Sergeant Taveras;
Detective Bonilla; Officer Jerry St. Louis, who recovered the
weapon; and Samantha Rappa-Jiovagnoli of the New York City
Office of Chief Medical Examiner, a forensic specialist who
conducted DNA testing on certain evidence.

Reardon, Westfall, and Hughes testified to the
robberies and their aftermath.  Reardon testified that after she
entered her apartment building on the morning of April 6, she
heard "murmuring" and noticed that someone had caught the door
behind her.  T. 5:12-15, ECF No. 16-1.  She "looked at the
person and tried to figure out who it was," thinking it might be
the new superintendent.  *Id.* at 5:16-20.  When the intruder
first entered the building, he was wearing a hoodie with the
hood up, but nothing covered his face.  *Id.* at 6:14-19, 25:18-

21.   Reardon confirmed that she was able to see the individual's face at that time.  *Id.* at 6:14–16.  It was a "bright, sunny, spring day" and the lighting in the lobby, which had two glass doors, was "very bright."  *Id.* at 6:20-24.  She told him that he did not belong there.  *Id.* at 25:5-20.  The intruder then told Reardon to "get into the elevator."  *Id.* at 10:3-5, 25:22-26:6.  At that point, he "pulled a mask over his face from somewhere around his neck."  *Id.* at 10:3-5.  The mask covered his face to the "nose area," but it "didn't cover his eyes."  *Id.* at 28:1-2.

Westfall, in turn, testified to being robbed on April 12.  When she saw the suspect, he was wearing a "brown hoody" and "ski mask."  *Id.* at 39:2-4, 40:1-3.  Westfall testified that the mask went "up to his nose" but that it was not covering his eyes.  *Id.* at 39:8-15.  When asked whether she could see part of his face, Westfall replied, "Yes."  *Id.* at 39:16-18.  She could also "tell his height . . . [and] build."  *Id.* at 40:1-3.  The vestibule in her building, too, was brightly lit. *Id.* at 40:6-12.

Sergeant Taveras testified to the immediate aftermath of the Westfall robbery.  Taveras was in an unmarked car with Officer Arias, stopped at a red light, when they "heard a female screaming."  *Id.* at 69:12-20.  "Soon after," they saw a man pass them on a small, purple bicycle with "a female purse on the bar of the bike."  *Id.* at 70:1-14.  A "couple of people and the

12

female" pointed towards him.  *Id.* at 70:22-23.  Sergeant Taveras described the man as being "covered up" and wearing a sweatshirt that "at that time . . . looked red," but that he later saw as "brown," and a "black jacket."  *Id.* at 70:3-71:4.  They followed the man and put out a radio alert regarding a "male[,] black, red sweatshirt" and his location.  *Id.* at 73:1-2.

Officer Hughes testified that he heard the radio alert, and then – approximately twenty or thirty seconds later – saw a man who fit the description turning onto Wallabout Street.  T. 97:7-25, ECF No. 16-2.  Following the suspect in his vehicle, and while about "two car lengths away," Hughes "saw [the suspect] go into his waistband," take a "metallic" object, and "throw it over the fence" of a tire shop at 398 Wallabout Street.  *Id.* at 100:1-6, 101:14-17.  Officer Hughes then "jumped the curb" to "try to block" him.  *Id.* at 98:8-12.  At that point, he saw the suspect's face "very quickly."  *Id.* at 116:16-17, 118:3 (Hughes got a "[f]leeting glimpse of his face").  The suspect was wearing the hood up, but his face was not "completely conceal[ed]."  *Id.* at 116:21-24.  Hughes testified that when he jumped the curb, the suspect looked him "right into the face with a sheer mask of terror," likely because he thought Hughes was going to run him over.  *Id.* at 119:4-6.  Hughes testified that the street was "very well-lit."  *Id.* at 125:6.

13

Reardon, Westfall, and Hughes all identified Daniels in court.  *See* T. 89:17-23 (Reardon), ECF No. 16-1; *id.* at 40:13-16 (Westfall); T. 99:12-13 (Hughes), ECF No. 16-2.  Other witnesses testified about evidence recovered — the brown hoodie and black sweater, the weapon, and the bicycle.  Officer St. Louis testified about recovering the weapon, which was actually a "simulated firearm" made from a cylindrical pipe with "two screwdrivers inside of a [black] sock" with a "purple band around it" to simulate a handle.  T. 136:19-23, ECF No. 16-2.  The parties stipulated that Nagy Bekhit from the NYPD's criminalistics section would have testified that the weapon had become contaminated in police custody, and that Detective Cynthia Ramirez from the NYPD's latent print section would have testified that no recovered fingerprints matched Daniels'.  *Id.* at 204:9-205:6, 205:24-206:9.  Rappa-Jiovagnoli testified that Daniels' DNA was found on the brown "sweater" that officers recovered on the ground and on both bicycle handlebars.  *Id.* at 241:12-21.  She also stated that there was "very strong" support for a determination that Daniels was a DNA contributor to the black sweater and the two socks.  *Id.* at 241:10-21.

At the conclusion of the State's case-in-chief, Daniels' counsel moved for dismissal, alleging that the State had failed "to prove a prima facie case."  T. 255:3-6, ECF No. 16-3.  Justice Tomei denied the motion.  *Id.* at 255:7.

2.  <u>Defense Case</u>

Daniels was the only defense witness; he denied involvement in either robbery.  He testified on direct examination that he "guess[ed]" he had been home on the morning of April 6, 2012, when the Reardon robbery occurred.  *Id.* at 259:25-260:2.  During cross-examination, however, he acknowledged having testified to the grand jury that he had been installing air conditioners for "Miss Mimi," the mother of his then-girlfriend Vicky Moffitt, that morning.  *Id.* at 272:8-12.  Daniels then took the position during cross-examination that he had, in fact, been at Miss Mimi's on the morning of April 6th.  *Id.* at 274:6-11.

Daniels also testified to the events of April 12, 2012, the night of the Westfall robbery.  He stated that at around 9:00 p.m., he was in the apartment of his upstairs neighbor, Stephanie Simon.  *Id.* at 261:5-262:1.  Daniels claimed to have been doing contracting work for Simon, which he finished around 9:30 or 9:45 p.m.  *Id.* at 265:21-23.  When he left, he headed towards a McDonald's on Broadway, which would have been about a twenty-minute walk.  *Id.* at 266:1-10.  Daniels testified that in the vicinity of Wallabout Street and Flushing Avenue, he saw a man "peeking out" from between parked cars, who suddenly "jump[ed] out," dropped a bicycle on the sidewalk, and ran off.  *Id.* at 266:11-24.  Daniels said that he walked over to the

bicycle and picked it up, thinking that he might be able to fix it up for his daughter. *Id.* at 309:20-310:22. As he picked it up, a piece of the bike fell off; it was a "weird" object that looked like a pipe – the exhibit that the State later introduced. *Id.* at 267:4-6. Daniels testified that, thinking nothing of the object, he threw it over a fence and started to ride the bicycle. *Id.* at 267:10–11. Within a few minutes, a police car drove up, cut him off on the sidewalk, and yelled for him to "freeze." *Id.* at 267:11-14. Daniels testified that he fled on the bicycle, believing he might be in trouble for taking it. *Id.* at 267:15–17. He then discarded the bicycle and walked home. *Id.* at 318:3–319:18. Daniels recalled wearing construction clothing that night, including a blue jacket, a brown hoodie, and dark blue pants. *Id.* at 268:4-6.

### 3. State's Rebuttal Case

In rebuttal, the State introduced the audio recordings of two phone calls that Daniels made while incarcerated at Rikers Island to Vicky Moffitt.[5] Daniels was heard on the recordings asking Moffitt to convince Stephanie Simon, a woman

---

[5] Transcripts of Daniels' calls do not appear in the record. The trial transcript indicates that the audio recordings were played in court, but the court reporter did not transcribe the calls. *See* T. 355:13, ECF No. 16-3 ("Whereupon, an audiotape [of the April 29, 2012 call] was played."); *id.* at 357:20 ("Whereupon, an audiotape [of the May 2, 2012 call] was played."). Daniels does not question the accuracy of the State's representations of the contents of those calls.

named Danielle,[6] and Miss Mimi to testify in his defense at
trial.  Aff. in Opp'n to Pet. ("Opp'n Br.") ¶¶ 28-30, ECF No.
16.[7]  During the April 29, 2012 call, Moffitt stated that Daniels
was asking Simon to "lie in court" because Daniels was not, in
fact, at Simon's home on April 12.  *Id.* ¶ 28.  Daniels replied,
"I know, but I need her, I need her."  *Id.*  On the recording of
the May 2, 2012 call, Moffitt was heard saying that Miss Mimi,
too, was afraid that she and Danielle would "get caught out
there with perjury" if questioned about when Daniels was in her
home.  *Id.* ¶ 29.  Daniels responded that Miss Mimi and Danielle
would not get in trouble because nobody had seen him, and "them
people lie every day."  *Id.*  In that call, Daniels also told
Moffitt that Simon did not need to give an exact time that he
left her apartment – just that he left before 10 p.m., because
the incident occurred at around 9:45 p.m.  *Id.* ¶ 30.

4.  <u>Conviction and Sentencing</u>

The bench trial concluded on May 19, 2014.  That same
day, Justice Tomei found Daniels guilty of two counts of Robbery
in the First Degree — one each for the Reardon and Westfall
robberies – and one count each of Attempted Assault in the

---

[6] Danielle's last name does not appear in the record.

[7] In his reply to the State's opposition brief, Daniels does not contest
the State's account of the call recordings that the State played at trial.
*See generally* Pet. Reply, ECF No. 17.

Second and Third Degrees for Westfall.[8]  T. 390:4-25, ECF No. 16-
3.  Daniels was sentenced on June 11, 2014.  Justice Tomei found
that Daniels qualified as a "second violent felony offender"
under Article 70 of the New York Penal Code due to his prior
convictions for Robbery in the Third Degree and Robbery in the
First Degree.  Sentencing Transcript ("S.") 2:9-3:19, 4:18-19,
ECF No. 16-3.  In light of this designation, the judge sentenced
Daniels to twenty years' imprisonment and five years' post-
release supervision on each of the two Robbery counts, two-to-
four years' imprisonment on the Attempted Assault in the Second
Degree conviction, and a conditional discharge on the conviction
for Attempted Assault in the Third Degree.  *Id.* at 7:3-24.  All
sentences were to run concurrently.  *Id.*

**C.   Appeals and Collateral Proceedings**

Daniels filed a pre-appeal motion to vacate the
judgment of conviction under C.P.L.R. § 440.10, *see* Mot. to
Vacate, ECF No. 16-4, which Justice Tomei denied.  *See* Order
Denying Mot. to Vacate, ECF No. 16-6.  Daniels then appealed his
convictions to the Appellate Division, Second Department.  That

---

[8] Although Attempted Assault in the Third Degree is a lesser-included
offense of Attempted Assault in the Second Degree, *see People v. Santos*,
982 N.Y.S.2d 183, 184 (App. Div. 2d Dep't 2014), Daniels does not raise a
double jeopardy argument on this point.  In any event, habeas relief would be
unavailable on such a claim because his sentences are running concurrently.
*See Kassir v. United States*, 3 F.4th 556, 569 (2d Cir. 2021) ("Courts may
decline to consider collateral challenges to a conviction's validity if the
petitioner is concurrently serving an equal or longer sentence on another
valid count of conviction.").

court affirmed the conviction and sentence.  *See People v. Daniels*, 78 N.Y.S.3d 678 (App. Div. 2d Dep't 2018).  Daniels then sought leave to appeal to the New York Court of Appeals, which was denied; the conviction therefore became final on November 30, 2018.  *See People v. Daniels*, 115 N.E.3d 633 (N.Y. 2018).  Daniels also filed two additional motions to vacate the judgment of conviction under C.P.L.R. § 440.10 – one in 2018 and another in 2019.  *See* 2018 Mot. to Vacate, ECF No. 16-13; 2019 Mot. to Vacate, ECF No. 16-17.  The state Supreme Court denied both motions.  *See* 2018 Order Denying Mot. to Vacate, ECF No. 16-15; 2019 Order Denying Mot. to Vacate, ECF No. 16-19.  And the Appellate Division denied leave to appeal those decisions.  *See* 2018 Order Denying Leave to Appeal, ECF No. 16-16; 2020 Order Denying Leave to Appeal, ECF No. 16-20.

This petition was filed on November 20, 2019, within the one-year statute of limitations set out by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2244(d)(1).  The respondent acknowledges that Daniels' claims have been fully exhausted.  Opp'n Br. ¶ 2.

## II.  Legal Standards

28 U.S.C. § 2254, as amended by AEDPA, governs an application for a writ of habeas corpus for a person in custody pursuant to the judgment of a state court.  Under AEDPA, a petitioner challenging a determination that was "adjudicated on

the merits" in state court must demonstrate that the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).  The state court's findings of fact are "presumed to be correct," and the petitioner can rebut this presumption only "by clear and convincing evidence." *Id.* § 2254(e)(1).

A legal conclusion is "contrary to" clearly established federal law if it "contradicts the governing law set forth in" the Supreme Court's cases or "confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, yet "arrives at a result different from [that] precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003).[9]  And a decision involves an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle" in the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  It is the

_____

[9] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

petitioner's burden to show that the state court applied the governing principle in an objectively unreasonable manner. *Price*, 538 U.S. at 641.

It is not enough that the federal court conclude, in its independent judgment, that the state court's decision was incorrect or erroneous: "[A] state court decision must be not only erroneous but also unreasonable.  Some increment of incorrectness beyond error is required." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

### III. Discussion

### A.   Identification Procedures and Evidence

Liberally construed, the petition makes two claims related to the identification of Daniels: (1) the pretrial identification procedures – both the photo array and the lineup – were unduly suggestive; and (2) the identification evidence at trial was insufficient to convict.

### 1.   The Photo Array Shown to Officer Hughes

The Due Process Clause of the Fourteenth Amendment forbids identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384 (1968).  "For both pretrial and in-court identifications, the linchpin of admissibility is reliability." *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir. 1994).  Even

"[i]f pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable."  *Id.* Independent reliability is assessed on the basis of "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Id.*  If, however, no impermissibly suggestive procedures have been employed, then "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury."  *Id.* at 1359.

Daniels asserts that the pretrial identification procedures were suggestive only in connection with Officer Hughes' identification – not the victim-witnesses'.  Pet. 29. He claims that Hughes "did not select petitioner based on his description," but instead because "petitioner's photo background was the only photo with a light background that made his photo standout" in the six-photo array.  *Id.*

Daniels raised this claim on direct appeal, so it is properly exhausted.  The Appellate Division found that the array was not suggestive because "the participants were sufficiently similar in appearance such that there was little likelihood that

the defendant would be singled out for identification based on particular characteristics," and "the fact that the background of [Daniels'] photograph was lighter than the backgrounds of the others did not orient the viewer toward [Daniels] as the perpetrator." *Daniels*, 78 N.Y.S.3d at 679.

      This conclusion was not an unreasonable application of clearly established federal law.  In *Simmons*, the Court upheld the conviction of petitioner Thomas Simmons even though he had appeared in a disproportionate number of photos in the array, which primarily consisted of group photographs, and where the police had declined to conduct a subsequent lineup to corroborate the photo identification.  390 U.S. at 384-86.  The Appellate Division did not unreasonably apply this law in ruling that the comparatively lighter background of Daniels' photo "did not orient the viewer toward [Daniels] as the perpetrator." *Daniels*, 78 N.Y.S.3d at 679.

      I have reviewed a color copy of the photo array and cannot find that the array was impermissibly suggestive. Daniels' photograph did not stand out in any way as to telegraph his identity to the viewer.  The photographs all depict men who are black, bald, and around roughly the same age, and the background of each is a shade of gray.  Although the background of Daniels' photo is marginally lighter than the others, *see Daniels*, 78 N.Y.S.3d 678, the gray hues of the others are not

all uniform, either.  For these reasons, I cannot say that Daniels' photo is an outlier.  *See United States v. Douglas*, 525 F.3d 225, 243 (2d Cir. 2008) (no suggestiveness where all "head-shot photographs, all of brown-skinned, non-bespectacled men in roughly the same age group, with short-cropped hair, non-receding hairlines, and thin or trimmed mustaches").  Applying AEDPA's deferential standard, Daniels' claim cannot succeed. *See Velazquez v. Poole*, 614 F. Supp. 2d 284, 301 (E.D.N.Y. 2007) (reviewing a black-and-white copy of the challenged photo array and holding that the state courts did not contravene *Simmons* by concluding that the array was not unconstitutionally suggestive).

Moreover, even if the background did somehow render the array suggestive, there were independent indicia of reliability such that the trial court could properly have admitted Hughes' in-court identification.  *See Wong*, 40 F.3d at 1359.  Hughes was "close enough to see [the suspect's] face" for a "couple of seconds" in a "very well-lit area."[10]  T. 98:20, 116:12-17, ECF No. 16-2.  And Hughes had a direct line of sight because the suspect "looked [Hughes] right into the face" from

---

[10] Daniels has not said – at least explicitly – that it was improper to permit an in-court identification based on the allegedly suggestive identification procedures.  Regardless, that claim would be denied because he has not established that the pretrial identification procedures were unduly suggestive to begin with.

about "[a] foot" away.  *Id.* at 98:17, 119:4-5.  In *Wong*, the
Second Circuit explicitly held that a clear view of a suspect's
face for as little as "two to three seconds" is "sufficient for
identification."  40 F.3d at 1360.  Accordingly, the facts in
the trial record provide a sufficient basis to conclude that
Hughes' "pretrial identification was independently reliable and
thus admissible."  *Id.*

    2.   <u>The Lineup</u>

        Daniels does not argue that the lineup shown to
Hughes, Reardon, and Westfall was suggestive.  He argues instead
that none of the three should have participated in any
identification procedure in the first place, because they had
not seen the suspect's face.  Daniels appears to base this
argument on (a) Reardon's call to 911 minutes after the robbery
in which Reardon said the assailant was wearing a mask,[11] and (b)
Westfall's grand jury testimony that the assailant was masked.[12]
Pet. 2.  He alleges that Bonilla should have learned from
Westfall that "the suspect was wearing a mask the entire time"
and asserts that Westfall testified that she "only remember[ed]

---

[11] There is no transcript of Reardon's 911 call in the record.  As with
Daniels' Rikers Island calls, the trial transcript indicates that the audio
recording was played in court, but the court reporter did not transcribe the
call.  *See* T. 19:11, ECF No. 16-1 ("Whereupon, the audio [of the 911 call] is
played in open Court.").  At trial, Reardon testified that she told the 911
operator that the perpetrator "pulled [a] mask over his face."  *Id.* at 19:25-
20:1.  She explained, however, that she "did see him when he came in from the
second door, including after [seeing him in] the lobby."  *Id.* at 20:1-2.

[12] *See supra* n.4.

[Daniels] from the line-up." *Id.* at 20, 31-32.  Daniels

attempts to buttress this argument about the unreliability of

the lineup by pointing to instances in which the witnesses

allegedly mischaracterized his appearance. *See, e.g.*, *id.* at

27-28 (contending that "Petitioner did not fit the primary

'light skinned' nor 'pocked skinned' distinguishing

characteristics initially given by witnesses").

This argument is contradicted by the witnesses' trial

testimony.  Each of the witnesses testified that they saw at

least part of the perpetrator's face.  *See* T. 6:16 (Reardon),

ECF No. 16-1; *id.* at 39:18 (Westfall); T. 98:25 (Hughes), ECF

No. 16-2.  Reardon stated she was able to see the perpetrator's

face when he first followed her into the building unmasked.

T. 6:16, ECF No. 16-1.  She later clarified why she had

described the perpetrator to the 911 operator as having been

masked.  She explained that she "did see him [unmasked] when he

came in from the second door" of the entrance to the building

and that it was only later that he "pulled the mask over his

face."  *Id.* at 20:1-2.

Westfall, as noted above, testified that she saw the

upper portion of the perpetrator's face, including his eyes,

because his mask went only "up to his nose."  *Id.* at 39:2-23.

She testified clearly that she was able to identify Daniels

during the lineup because she remembered his appearance from the

robbery – specifically, from Daniels "beating [her] in [her] vestibule." *Id.* at 56:19-22.  Later, on cross-examination, when asked whether she "identified the defendant here today . . . based on how he looked at the lineup," Westfall answered, "Yes." *Id.* at 62:6-9.  But this testimony is not inconsistent with her having recognized him at the lineup as the person who robbed her.  Contrary to Daniels' assertion, Westfall never testified that she "only" recognized Daniels from the lineup.  *See* Pet. 26 (alleging "Westfall testified that she 'only' remember[ed] Petitioner from the line-up").

Hughes, for his part, testified that he saw the suspect's face from about "[a] foot" away in a "very well-lit area" while chasing the suspect from his car.  T. 98:13-25, ECF No. 16-2.  Against the backdrop of this testimony, Daniels identifies no clearly established law that was violated (or misapplied) by the admission of testimony concerning the lineup, and points to no objectively unreasonable determination of fact by the trial court.

   3.   <u>Insufficient Evidence to Convict</u>

The petition can also be read to challenge the sufficiency of the State's trial evidence — specifically, to assert that without the improper identification testimony, the remaining evidence was constitutionally insufficient.  Pet. 30-32 (alleging that "the People failed to prove Petitioner's guilt

beyond a reasonable doubt and the verdict was against the weight of the evidence"). This claim fails because Daniels' contention about the identification evidence is unavailing, as described above; because Daniels does not challenge the photo array shown to Westfall as suggestive; and also because the state court rejected the insufficient evidence contention on the merits and that rejection was not contrary to, or an unreasonable application of, clearly established federal law.

The Due Process Clause of the Fourteenth Amendment requires proof beyond a reasonable doubt for a conviction in state criminal proceedings. *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). In analyzing a sufficiency-of-the-evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Thus, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.

The Appellate Division denied Daniels' sufficiency claim on a procedural ground: namely, Daniels' failure to preserve the issue for appellate review. The Appellate Division

stated only that "[t]he defendant's contention, raised in his
main brief and *pro se* supplemental brief, that the
identification evidence was legally insufficient to support his
convictions of robbery in the first degree, is unpreserved for
appellate review," citing C.P.L.R. § 470.05(2).  *Daniels*, 78
N.Y.S.3d at 679.  That holding is brief and seemingly in tension
with the trial record, which shows Daniels' counsel moving for
dismissal at the conclusion of the State's case-in-chief.  *See*
T. 255:3-6, ECF No. 16-3.  Nevertheless, the Appellate Division
proceeded to deny the claim on the merits – holding that the
evidence "was legally sufficient to establish the defendant's
identity beyond a reasonable doubt."  *Daniels*, 78 N.Y.S.3d at
679.  This determination is thus entitled to AEDPA deference.

     Daniels' sufficiency challenge fails.  For one, I have
already rejected the claim that the identification testimony
should have been suppressed.  As noted above, all three
identification witnesses testified that they *did* see Daniels'
face.  Even "where there are conflicts in the testimony,
[federal courts] defer to the jury's determination of the weight
of the evidence and the credibility of the witnesses."  *United
States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000); *see also*
*Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)
("[A]ssessments of the weight of the evidence or the credibility
of witnesses are for the jury and not grounds for reversal on

appeal . . . .").  This deference applies with equal force to a judge's credibility determinations in a bench trial.  *See Vt. Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996) ("Credibility determinations . . . after a bench trial are entitled to great deference and will not be overturned on appeal unless clearly erroneous.").  And for sufficiency claims on habeas review under *Jackson*, 443 U.S. 307, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  Thus, I find no basis to question Justice Tomei's credibility determinations.

Moreover, the State put on a compelling case for Daniels' guilt.  In particular, three witnesses independently identified Daniels as the perpetrator, DNA found on items recovered from the scene matched his, and the Rikers call recordings revealed him attempting to concoct a false alibi.  On this record, I cannot say that the Appellate Division's ruling on the merits was contrary to, or an unreasonable application of, clearly established law.

## B.  Prosecutorial Misconduct

Daniels argues next that the prosecution engaged in misconduct by (1) failing to disclose exculpatory evidence under *Brady v. Maryland,* 373 U.S. 82 (1967); (2) failing to correct

false testimony from Bonilla; and (3) misstating the testimony of certain witnesses in its summation.

    1.   *Brady v. Maryland*

Daniels claims that the State violated *Brady* by withholding two pieces of evidence.  The first was Ms. Westfall's bag, which officers recovered on the street and returned to her that night; it was not produced to the defense or introduced at trial.  The second was a surveillance video recorded at 398 Wallabout Street on the date of the April 12 robbery, which Bonilla testified showed a police car pursuing a "a male on a bicycle."  Pet. 39-40; T. 162:8-16, ECF No. 16-2.

The prosecution has a constitutional obligation to disclose exculpatory evidence that "is material either to guilt or to punishment."  *Brady*, 373 U.S. at 87.  This obligation "covers not only exculpatory material, but also information that could be used to impeach a key government witness."  *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001).  Exculpatory evidence is considered "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

    a.   The Handbag Claim

The state court rejected Daniels' claim about the handbag on the merits.  Daniels' counsel did not raise this in

his appellate brief; instead, Daniels asserted it in his *pro se* supplemental brief.  Suppl. *Pro Se* Br. 30, ECF No. 16-11.  The Appellate Division did not specifically discuss the *Brady* claim relating to Westfall's purse, but it did hold that Daniels' "remaining contentions" — including those "raised in his *pro se* supplemental brief" — were "without merit."  *Daniels*, 78 N.Y.S.3d at 679.  The Second Circuit has held that a state court's denial of a federal claim as simply "without merit" "is deemed to rest on the merits of the federal claim . . . because there is no plain statement to the contrary."  *Jimenez v. Walker*, 458 F.3d 130, 133, 146 (2d Cir. 2006).  In such cases, "AEDPA deference applies."  *Id.*  Accordingly, the Appellate Division's decision on the *Brady* claim is accorded AEDPA deference.

Daniels does not point to any Supreme Court precedent that the Appellate Division's judgment allegedly contradicts. He asserts that the handbag should have been tested for DNA, which "could have clearly exonerated" him.  Pet. 12.  But the Supreme Court's jurisprudence establishes that a complaint about the inability to conduct DNA testing is not a *Brady* claim *per se*, given the uncertainty as to whether the results would actually have been exculpatory.  *See Skinner v. Switzer*, 562 U.S. 521, 536 (2011) ("Unlike DNA testing, which may yield exculpatory, incriminating, or inconclusive results, a *Brady*

32

claim, when successful postconviction, necessarily yields evidence undermining a conviction . . . .").

Instead, the Supreme Court has identified a different (and higher) threshold for allegations that "potentially useful" evidence has been withheld. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). "Potentially useful evidence" means "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. The failure to preserve such evidence – unlike the failure to preserve actual *Brady* material – does not violate a defendant's federal due process rights "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58.

Because Daniels has pointed to no evidence of bad faith, this *Brady* claim fails on the merits, even absent AEDPA deference.

b.   The Surveillance Video Claim

Daniels did not raise the surveillance video claim until his *second* Section 440 motion. *See* ECF No. 16-17. Accordingly, the state Supreme Court found it to be procedurally barred under state law. *See* ECF No. 16-19. In reaching that conclusion, the state court cited both C.P.L.R. § 440.10(2)(c), which precludes collateral review of an issue that the defendant was in the position to raise on direct appeal, and Section

440.10(3)(c), the rule that Section 440 courts may dismiss claims not raised in prior Section 440 motions.  *Id.* at 3.  The state procedural defect is an "adequate and independent state bar" preventing habeas relief on this claim.  *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001) (state court decision on petitioner's claim "rested on an adequate and independent state bar" where petitioner failed to raise it on direct appeal in accordance with Section 440.10(2)(c)); *Rosario v. Bennett*, No. 01-CV-7142, 2002 WL 31852827, at *21 (S.D.N.Y. Dec. 20, 2002) ("[D]istrict courts in this Circuit have consistently held that C.P.L.R. § 440.10(3)(c) constitutes an adequate and independent state ground barring habeas review.").  Accordingly, the petition cannot succeed on this basis.

Moreover, Daniels has not established that the surveillance video would actually have been exculpatory.  At most, Daniels' petition sets forth that the video had the *potential* to demonstrate his innocence.  Like the handbag claim, this argument is insufficient to obtain relief under *Brady* and is instead evaluated under *Youngblood*.  Daniels does not allege facts showing that the police acted in bad faith with respect to the video, either.  The claim therefore fails on this ground in addition to the state procedural bar.

34

2.   Use of False Testimony

Daniels also argues that the State elicited false testimony at trial regarding Daniels' identification.  These allegations include that: (1) Officer Hughes "lied about the clothing description" by testifying at trial that the NYPD radio call said the suspect was wearing a "brown hoody" after stating in his incident report that he heard "red hoody," Pet. 21-22; and (2) the State allowed Reardon to testify at trial that the suspect was "African American or dark skinned Latino," whereas she had previously told Bonilla that the suspect was "light skinned black or dark skinned Hispanic," and Daniels is "dark skinned."  Pet. 26.

The Appellate Division held that Daniels' claim regarding the use of false testimony was "without merit," and that was not an unreasonable application of the relevant federal law.  The Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the [trier of fact]."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of

35

confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Daniels has not established that the prosecution elicited any perjured testimony, let alone perjured testimony that could have affected Justice Tomei's judgment.  He points to no evidence of willful intent to provide false testimony – or evidence that the testimony was actually false in the first place.  Instead, he argues that the witnesses lied because they made statements that were inconsistent with previous statements.  But this is insufficient: "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."  *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001); *see also United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992) ("Differences in recollection alone do not add up to perjury.").

The record provides no basis to conclude that Hughes or Reardon lied.  At trial, Hughes testified that the radio transmission said that the suspect was wearing a "brown hoody." T. 97:7-8, ECF No. 16-2.  Although the radio transmission actually said the hoodie was red, *see* T. 73:7, ECF No. 16-1, by Daniels' own account Hughes had correctly described the transmission in his incident report.  *See* Pet. 21.  In any case, whether Hughes heard that the hoodie was red or instead brown is immaterial here.  Indeed, Sergeant Taveras testified that the

hoodie recovered at the scene "was brown, but it looked like it could be mistaken for red.  It was like a reddish [color] – brownish or reddish."  T. 82:25-83:1-2, ECF No. 16-1.  This testimony suggests that even upon close inspection, the color of the hoodie might reasonably have been described either way.  Thus, to the extent that Hughes' testimony was inconsistent with his previous statement, it was of no consequence.  And Reardon's testimony that her assailant was "African American or more of a darker skinned Latino" is consistent with her previous description of the suspect as "light-skinned Black or Hispanic." *Id.* at 6:9-10, 58:9-11.  Without more, Daniels' allegations suggest – at most – that the witnesses' testimonies may have contained minor inconsistencies.  Daniels has not, however, shown that any witness committed perjury.  This argument therefore fails.

    3.   <u>False Statements in Summation</u>

       Daniels also argues that the prosecution marshaled false statements in summation.  He alleges that the prosecutor falsely stated that: (1) police found Daniels' clothing "directly across the street" from the simulated gun and "less than half a block" from the purse, but the clothing was actually found in a different location; (2) Officer Hughes "observed petitioner fleeing 155 Manhattan Avenue," Westfall's apartment building, when Hughes actually testified that he first saw

Daniels on Throop Avenue; and (3) Sergeant Taveras "broadcast" a description of the suspect as having a "purple bike and red purse," when, in fact, Taveras's radio transmission said "BMX bicycle" – but did not include the color – and made no mention of a purse.  Pet. 15-16, 23-24 (referring to T. 375:19-20, 378:10-12, 379:1-7, 382:6-8, ECF No. 16-3).  The Appellate Division denied this claim, too, on the basis that it was "without merit."  *Daniels*, 78 N.Y.S.3d at 679.  This determination on the merits contravened no clearly established law and rested on no unreasonable determination of fact.

    "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding."  *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (affirming denial of habeas petition).  And "rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal."  *Ekukpe v. Santiago*, 823 F. App'x 25, 33 (2d Cir. 2020).  "Indeed, where the jury's verdict finds substantial support in the evidence, counsel's improper statements will frequently be *de minimis* in the context of the entire trial."  *Id.*  The Second Circuit applies a three-factor test in determining the existence of "substantial prejudice" where a prosecutor's summation is challenged: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction

absent the improper statements." *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990).  Habeas relief is the proper remedy only in those "rare cases where the improper comments in a prosecutor's summation were so numerous and, in combination, so prejudicial that a new trial is required." *Id.*

The statements challenged by Daniels do not evidence misconduct at all, let alone the level of egregious misconduct required to obtain the writ.  The statement about where officers found Daniels' clothing was not false; instead, the prosecutor accurately summarized the testimony of Detective Bonilla and Sergeant Taveras when she said that Daniels' clothing was found across the street from where they found the simulated gun and less than half a block from the purse.  *See* T. 73:22-75:4 (Bonilla), 87:3-88:24 (Taveras), ECF No. 16-1.

The other two statements did exhibit minor inaccuracies, but they do not approach the level of substantial prejudice.  Daniels is correct that the prosecutor mistakenly stated that Taveras's *broadcast* included the color of the bicycle and mention of the purse.  But Daniels does not say why these inaccuracies would have mattered, and the materiality does not appear on the face of the record.  There is, for example, no suggestion that Taveras was referring to a different handbag or bicycle.  And as the prosecutor correctly stated in summation,

Taveras testified in court to the color of both items. *See id.* at 70:5-14.

Daniels is correct that the prosecutor referred to Hughes' having "identified the defendant . . . as the person that he observed fleeing 155 Manhattan Avenue" (Westfall's address), when in fact Hughes testified that he saw the suspect on "Throop Avenue . . . one block south of Wallabout." T. 97:11-15, ECF No. 16-2. This statement was also immaterial, however. The testimony at trial established that: (1) Westfall saw the suspect fleeing from the immediate vicinity of 155 Manhattan Avenue on a "dark-colored BMX bike," T. 44:11-24, ECF No. 16-1; (2) soon thereafter Sergeant Taveras and Officer Arias saw the suspect riding a "purple" bicycle that "looked like a BMX" on Manhattan Avenue, *id.* at 69:7-71:18; and (3) then Officer Hughes saw the suspect riding a "purple" "BMX type" bicycle on Throop Avenue. T. 97:11-12, ECF No. 16-2. None of this testimony provides a basis for relief.

In light of all the evidence before the judge, these two misstatements did not cause substantial prejudice such that they warrant a new trial. *Cf. United States v. George*, No. 11-CR-250, 2012 WL 2564373, at *19 (E.D.N.Y. June 29, 2012) ("[W]hile the court finds that the government did misstate testimony, when viewed against the entire argument to the jury and placed in context of the court's instructions [to the jury]

and the sufficiency of the evidence, the misstatement was not plain error or flagrant abuse warranting a new trial.").  As discussed, the totality of the evidence was substantial. Against this overwhelming evidence of Daniels' guilt, the prosecutor's two misstatements were not material to the verdict.

Moreover, "the risk of prejudice is much less in a bench trial than in a jury trial; presumably the trial judge is aware of the inferences he may draw." *Jones v. LeFevre*, No. 86-CV-518, 1987 WL 8404, at *5 (E.D.N.Y. Mar. 4, 1987); *see also United States v. Foley*, 871 F.2d 235, 240 (1st Cir. 1989).  The judge is "presumed to have considered only admissible evidence in making [his] findings." *Bodenburg v. Conway*, No. 05-CV-01119, 2007 WL 2295812, at *10 (E.D.N.Y. Aug. 4, 2007).  There was also no jury to whom the judge could have given a curative instruction.  *See id.* ("[T]he case was a bench trial, so it was not a situation where the judge could have attempted to cure any prejudice by an instruction to the jury.").  For this reason, too, Daniels' argument is unavailing.

## C.   Ineffective Assistance of Counsel

Daniels next asserts various ineffective assistance of trial counsel claims.  Only one of these arguments — relating to trial counsel's omission to assert an affirmative defense — was exhausted before the state courts, which found it meritless. Daniels' other ineffective assistance arguments were not

41

properly presented to the state courts and are thus procedurally barred.

On habeas review, the question is whether the state court's ineffective assistance determination was contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams*, 529 U.S. at 390. Pursuant to *Strickland*, an individual claiming ineffective assistance (1) "must show that counsel's performance was deficient," such that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) "that the deficient performance prejudiced the defense" in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Combined with the deference built into AEDPA, habeas review of ineffective assistance claims becomes "doubly deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

1. The Affirmative Defense Under Section 160.15(4)

On direct appeal, Daniels asserted that his trial counsel was constitutionally ineffective because he failed to

42

assert the affirmative defense that the weapon used in one of
the two robberies — the Reardon robbery — was inoperable.  Pet.
16.  The Appellate Division denied the claim without
elaboration, finding it to be "without merit."  *Daniels*,
78 N.Y.S.3d at 679.  Accordingly, this claim was properly
exhausted under AEDPA, and the Appellate Division's judgment is
subject to deferential review.  *See Jimenez*, 458 F.3d at 146.
Against that background, Daniels is not entitled to habeas
relief.

As noted above, Daniels was convicted of two counts of
first-degree robbery in violation of N.Y. Penal Law § 160.15 —
one for the Reardon robbery and one for the Westfall robbery.
These convictions were returned under two different subdivisions
of Section 160.15.  The judge convicted Daniels under Section
160.15(4) in connection with the Reardon robbery, from which the
weapon the suspect displayed was not recovered.  T. 390:4-8, ECF
No. 16-3.  Pursuant to Section 160.15(4), a person is guilty of
first-degree robbery if, in the course of "forcibly" stealing
property, he:

> Displays what appears to be a pistol, revolver, . . .
> or other firearm; *except* that in any prosecution under
> this subdivision, *it is an affirmative defense* that
> such pistol, revolver . . . or other firearm was not a
> loaded weapon from which a shot, readily capable of
> producing death or other serious physical injury,
> could be discharged.

N.Y. Penal Law § 160.15(4) (emphases added).  The judge
convicted Daniels under a different provision of the statute –
Section 160.15(3) – in connection with the Westfall robbery,
where the simulated firearm *was* recovered.  Under that
provision, a person commits first-degree robbery when, in the
course of forcibly stealing property, he "[u]ses or threatens
the immediate use of a dangerous instrument."  N.Y. Penal Law
§ 160.15(3).

        Thus, Daniels is arguing that his counsel was
constitutionally ineffective for failing to request an
instruction concerning the inoperability of a weapon that was
never recovered.  This argument was not necessarily impossible
to make, as the two victims did offer similar descriptions of
the weapons used during the two robberies.  T. 11:1, 18:17-19,
41:22-25, 42:1-2, ECF No. 16-1.  In essence, Daniels is arguing
that his counsel should have asked the judge to infer that the
Reardon weapon, which they did not have in evidence, was the
same kind of contraption as the Westfall weapon, which the judge
did.

        This claim of ineffective assistance fails, however,
for two primary reasons.  First, the decision not to pursue this
affirmative defense did not fall "outside the wide range of
professionally competent assistance," *Bennett*, 663 F.3d at 84,
because defense counsel could reasonably have concluded that it

would have undermined Daniels' chances of acquittal.  Second,
even if this decision constituted an error, it did not prejudice
Daniels because Justice Tomei sentenced him to concurrent — and
identical — sentences on each of the two robbery counts.  Thus,
a victory on the Reardon count would not result in Daniels being
released any earlier than he is currently scheduled to be.  *See
Kassir*, 3 F.4th at 569 (2d Cir. 2021) (declining to reach the
merits of a collateral challenge to a conviction where defendant
who was serving concurrent sentences had "no reasonable prospect
of a shorter time in custody").

      Trial counsel exercised "reasonable professional
judgment" in not raising this defense.  Daniels' theory of the
case was, at bottom, an identity defense: that he was not the
assailant.  He testified as much.  T. 260:16-22, 269:3-4, ECF
No. 16-3 (denying having ever seen Reardon or Westfall, let
alone having robbed them).  And experienced trial counsel know
that the pursuit of alternative defense theories — even if they
are not technically mutually exclusive — can dilute the power of
both.  *See United States v. Balis*, No. 03-CR-1028, 2009 WL
1117274, at *6 (S.D.N.Y. Apr. 24, 2009).  In *Cruz v. Colvin*, a
court in this District held that "counsel's decision not to
assert the affirmative defense" under N.Y. Penal Law § 160.15(4)
did not constitute ineffective assistance where the defense's
"theory of the case" was one of "mistaken identity."  No. 17-CV-

3757, 2019 WL 3817136, at *15 (E.D.N.Y. Aug. 14, 2019).
Generally speaking, "competent trial counsel know that
reasonableness is absolutely mandatory if one hopes to achieve
credibility with the [trier of fact]," and that arguing
alternative theories can put this credibility at risk. *Williams
v. Walker*, 1993 WL 22128, at *6 (S.D.N.Y. Jan. 26, 1993) (trial
counsel not constitutionally deficient for failing to raise
intoxication defense where theory at trial was factual innocence
and mistaken identity).

Further, trial counsel's alleged error would not have
given rise to *Strickland* prejudice.  A vacatur of the conviction
for the Reardon robbery would not alter Daniels' position
because he would still be left to serve the concurrent sentence
for the Westfall robbery.  Moreover, any potential collateral
consequences of conviction — standing alone — are insufficient
to establish *Strickland* prejudice under AEDPA.  *See Tavarez v.
Larkin*, 814 F.3d 644, 649 (2d Cir. 2016); *Kassir*, 3 F.4th at 566
("Relief from fines, special assessment fees, restitution, and
other noncustodial punishments . . . cannot themselves serve as
bases for collateral relief.").  Therefore, Daniels' claim on
this point fails.

    2.   <u>Other IAC Claims</u>

Daniels' petition levels a number of other ineffective
assistance of counsel claims, but none are properly exhausted.

Daniels argues that trial counsel was ineffective for failing to (1) request an adverse-inference instruction concerning Westfall's purse not being tested for fingerprints or DNA, *see* Pet. 12; (2) object that the surveillance videotape was not produced, *see id.* at 12, 18-19, 22-23, 39-40; and (3) object to the "false" identification testimony. *See id.* at 28-29, 35.

The Second Department denied these ineffective assistance claims as procedurally barred under both C.P.L.R. § 440.10(2)(c), which precludes collateral review where a defendant could have raised the issue on direct appeal but did not, and Section 440.10(3)(c), the rule providing that courts may dismiss claims not raised in prior Section 440 motions. These decisions are "adequate" to deny relief here because the procedural bar applies to ineffective assistance claims on habeas review "where the trial record provided a sufficient basis" for review on direct appeal. *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003) (collecting cases). The New York Court of Appeals has observed that "[g]enerally, the ineffectiveness of counsel is not demonstrable on the main record," *People v. Brown*, 382 N.E.2d 1149, 1149 (N.Y. 1978), and in those cases an exception to the procedural rule applies. *See Fulton v. Graham*, 802 F.3d 257, 263 (2d Cir. 2015). Nevertheless, a claim for which there was an adequate record on direct appeal does "not fall within any of the exceptions [to the procedural bar] noted

by the New York courts." *Sweet*, 353 F.3d at 140.  Daniels'
claims plainly do not turn on facts outside the record.
Accordingly, the procedural bar applies because Daniels failed
to pursue his ineffective assistance claim on direct appeal
despite having a sufficient record at that time.

## D.   Double Jeopardy

The indictment charged two counts of Robbery in the
First Degree, N.Y. Penal Law § 160.15(3), 160.15(4), and two
counts of Robbery in the Third Degree, N.Y. Penal Law § 160.05,
a lesser-included offense of first-degree robbery.  Daniels was
acquitted of Robbery in the Third Degree and convicted of
Robbery in the First Degree.  He argues that his right against
being tried twice for the same crime was violated by (1) the
grand jury's decision to charge him with both crimes, and
(2) the trial court's consideration of both.

The state court found these claims to be procedurally
barred from review pursuant to C.P.L.R. 440.10(2)(c), because
they are based entirely on matters appearing within the record
and could have been raised on direct appeal.  2018 Order Denying
Mot. to Vacate 4, ECF No. 16-15.  This is an adequate state-law
ground.  *See Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001).
The court found, in the alternative, that the claims were
meritless.  This was not an unreasonable application of clearly
established federal law.

Daniels did not face double jeopardy.  The test for determining whether two crimes constitute the same offense for double jeopardy purposes was set forth by the Supreme Court in *Blockburger v. United States,* 284 U.S. 299 (1932).  Under *Blockburger,* an individual may not be successively prosecuted for both a greater and lesser-included offense because the lesser offense requires no proof beyond that which is required for conviction of the greater offense.  *See Brown v. Ohio*, 432 U.S. 161, 168-69 (1977).  But "the State is not prohibited by the Double Jeopardy Clause from charging respondent with greater and lesser included offenses and prosecuting those offenses in a single trial."  *Ohio v. Johnson*, 467 U.S. 493, 500 (1984).  After finding Daniels guilty of Robbery in the First Degree, Justice Tomei stated that he "[found] it unnecessary to render a verdict" on the third-degree robbery "in light of [his] verdict" on the first-degree count.  T. 390:4-19, ECF No. 16-3.  This was proper.  There is "no violation of the defendant's right to be free from double jeopardy" provided that "the court enter[s] judgment on only one of the multiplicitous counts," *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006), as Justice Tomei did here.  Daniels' argument accordingly fails.

## E.    Lack of Probable Cause

Daniels argues that "falsely fabricated" accounts of the suspect's appearance provided the probable cause for his

arrest.  Pet. 35.  Daniels states that he self-surrendered to the police after detectives visited his house in response to an I-card that Detective Bonilla had issued.  *Id.* at 37.  Without those inaccurate descriptions, he suggests, no I-card would have been issued, he would not have self-surrendered to the police, and the lineup that led to his arrest would not have occurred.[13] *Id.*  In short, a series of falsehoods – in Daniels' telling – constituted the probable cause for his arrest and indictment.

This Fourth Amendment claim is not reviewable on habeas.  In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 494.  Following *Stone*, the Second Circuit limited habeas review of Fourth Amendment claims to two scenarios: (1) where "the state . . . provided no corrective procedures at all to redress the alleged [F]ourth [A]mendment violations" or (2) where "the state . . . provided a corrective mechanism, but the defendant was precluded

---

[13] Daniels also alleges that "false testimony" before the grand jury "misle[d] the grand jury" into returning an indictment against him.  Pet. 35. This is not a valid basis for habeas relief.  *See Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) (holding that "claims of deficiencies in the state grand jury proceedings are [not] cognizable in a habeas corpus proceeding").

Case 1:19-cv-06603-EK   Document 27   Filed 01/02/23   Page 51 of 54 PageID #: 1357

from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).  The first scenario is not present here. Indeed, "federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . ." *Id.* at 70 n.1.

Nor has Daniels has set forth an unconscionable breakdown in process.  The focus of this inquiry is on "the existence and application of the *corrective procedures* themselves" rather than on the "*outcome* resulting from the application of adequate state court corrective procedures." *Id.* at 71.  Daniels was accorded a *Dunaway* hearing prior to trial, at which Detective Bonilla testified and Daniels' counsel cross-examined her.  The court then issued a reasoned ruling addressing Daniels' claims.  Post-trial, Daniels took advantage of state appeal procedures.  Under those circumstances, there was no unconscionable breakdown of process.  *See, e.g.*, *Hicks v. Bellnier*, 43 F. Supp. 3d 214, 231 (E.D.N.Y. 2014) ("Petitioner would be hard-pressed" to establish such "an unconscionable breakdown" where "the trial court held an evidentiary hearing, allowed Petitioner to present a case in support of his motion, and issued a reasoned ruling that there was reasonable suspicion to stop Petitioner and that the resulting evidence would be admissible at trial"); *Singh v. Miller*, 104 F. App'x 770, 772 (2d Cir. 2004) (finding no unconscionable breakdown occurred

where petitioner raised his Fourth Amendment claims at a suppression hearing and on appeal).

Daniels is therefore not entitled to relief on this ground.

**F.    Actual Innocence Based on "New Evidence"**

Lastly, Daniels argues that the Court should grant his petition because he is actually innocent.  The Supreme Court has "never expressly held that a petitioner may qualify for habeas relief based solely on a showing of actual innocence."  *Rivas v. Fischeri,* 687 F.3d 514, 540 (2d Cir. 2012).  But it "has recognized that, in rare cases, an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar."  *Olivares v. Ercole*, 975 F. Supp. 2d 345, 352 (S.D.N.Y. 2013); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief.").  This "miscarriage-of-justice exception" recognizes that a sufficient showing of actual innocence is worthy of excusing procedural default.  *See House v. Bell*, 547 U.S. 518, 536 (2006).

To meet this standard, petitioners "must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt." *Id.* at 536–37.  In making this showing, petitioners must present "credible" and "reliable" evidence that was not presented at trial.  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Here, the only purported "new" evidence Daniels presents is trial testimony.  He claims that Sergeant Taveras's trial testimony revealed that Westfall heard the description of the suspect's clothes over the radio in the police car before giving the police her own description of them.  Pet. 7-8, 35. This is not "new" evidence because it was not discovered after trial – by its nature, the testimony existed and was presented to the jury at trial.  This is, in any event, not one of those "rare," "extraordinary" instances where a claim of actual innocence excuses default.  *Calderon v. Thompson*, 523 U.S. 538, 558 (1998).

## IV.  Daniels' Motion for Discovery

Daniels filed a discovery motion on February 22, 2021. Mot. for Discovery, ECF No. 18.  He contends that he was placed "under full blown arrest" prior to the lineup.  *Id.* at 4.  He seeks surveillance video from his lawyer's office — the location of his self-surrender — and the 90th Precinct from April 26, 2012, which would show him in handcuffs and in the custody of the police.  *See id.* at 5-6.  These claims do not relate to any ground raised in his habeas petition.  In any event, "a habeas petitioner, unlike the usual civil litigant in federal court, is

not entitled to discovery as a matter of ordinary course."
*Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Discovery may only
be granted upon a showing that there is "reason to believe that
the petitioner may, if the facts are fully developed, be able to
demonstrate that he is entitled to relief."  *Id.* at 908–09.
This motion is therefore denied.

## V.    Conclusion

For the reasons stated above, I deny Daniels' claims
as meritless or procedurally barred.  Because Daniels has not
made a "substantial showing of the denial of a constitutional
right," a certificate of appealability will not issue.
28 U.S.C. § 2253.  I certify pursuant to 28 U.S.C. § 1915(a)(3)
that any appeal would not be taken in good faith and *in forma
pauperis* status is therefore denied for purposes of an appeal.
*Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).
Daniels, however, has a right to seek a further certificate of
appealability from the Court of Appeals for the Second Circuit.
*See* 28 U.S.C. § 2253(c)(1).


SO ORDERED.


                                    /s/ Eric Komitee
                                 ERIC KOMITEE
                                 United States District Judge


Dated:     January 2, 2023
           Brooklyn, New York